UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AGINAH KENDRICK,                    :        Case No. 3:11-cv-404
                                    :
        Plaintiff,                  :        Judge Timothy S. Black
                                    :
vs.                                 :
                                    :
WALGREEN COMPANY, *et al.*,         :
                                    :
        Defendants.                 :
_____

**DECISION AND ENTRY: (1) GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. 32); AND (2) DENYING PLAINTIFF'S
MOTION TO STRIKE (DOC. 42)**
_____

This civil case is before the Court on the Motion for Summary Judgment (Doc. 32)

filed by Defendants Walgreen Company ("Walgreen"), William Lemen ("Lemen") and

Marie Smith ("Smith") (collectively referred to as "Defendants"). Plaintiff Aginah

Kendrick ("Plaintiff") filed a response to Defendants' Motion. (Doc. 38). Thereafter,

Defendants filed a Reply. (Doc. 40). The Motion is ripe for decision.

## I. STATEMENT OF FACTS

Defendant Walgreen Company ("Walgreens") is an Illinois-based employer

engaged in the retail sale of prescription and non-prescription drugs and general

merchandise through its drug stores operated in all fifty states. Walgreens divides its

operations into geographic regions, assigning a District Manager with responsibility for

drug stores within their jurisdiction.

Walgreens' drug stores are staffed with a Store Manager, and management teams comprised of Executive Assistant Store Managers ("EXA") and Drug Store Management Trainees ("MGT"). The EXA position is a training role for employees aspiring to become Store Managers. EXAs are responsible for direction of personnel and supervision of store operations and report directly to the Store Manager. MGTs report to Store Managers and EXAs and are responsible for inventory control, merchandise stocking, work schedules and coordinating store openings, closings and shift changes.

Plaintiff, an African-American female, started her career with Walgreens in August 1999 as a cashier. Over the next ten years, Plaintiff worked in different roles in several stores, all within the Dayton District. Plaintiff's performance ratings in her evaluations from 2007 to 2009 were 3 or above, which means she met expectations or was above average. In April 2009, Plaintiff held an MGT position and transferred from a Walgreens store in Troy, Ohio to the Walgreens store on Miamisburg Centerville Road, in Dayton ("Centerville Store"). At that time, she reported to Centerville Store Manager, Tracy Pollard ("Pollard"), an African-American, who in turn reported to Regional Manager, Defendant Marie Smith, an African-American.

In mid-October 2009, as a result of a number of issues in her personal life, including breaking up with her boyfriend, Plaintiff "turned to alcohol" and began "drinking heavily." On or about October 15, 2009, Plaintiff reported to an emergency room. The on-call physician, Dr. Gary Balster, noted that Plaintiff had been "drinking

prodigious quantities of alcohol" for several days. Plaintiff's was diagnosed with major depression and recurrent alcohol abuse/dependence.

Upon admission to the hospital, Plaintiff called Pollard, her store manager at the time, to report off from work for the remainder of the week of October 14 through October 18. Plaintiff also called Pollard during the week "to update him." Plaintiff's absences for the week of October 14 were excused.

Plaintiff was discharged from the hospital on or about October 19, 2009. Upon discharge, Plaintiff immediately started the application process for disability leave.[1]

On October 20, 2010, Defendant William Leman became the Centerville store manager. Within days thereafter, Plaintiff was approved for short-term disability leave from October 22, 2009 through November 30, 2009.

According to Lemen, he received an email confirming Plaintiff's leave approval and the duration of the approved leave, but he was never informed as to the reasons for Plaintiff's leave.[2] Plaintiff's short term disability leave was subsequently extended

---

[1] Walgreens provides its employees with paid leave benefits, including long and short term disability, military, personal, and funeral leave as well as leave under the Family and Medical Leave Act, and furnishes information on these polices as well as the requisite forms to initiate a leave request on the Company intranet available to all employees.

[2] Walgreens retains the services of a third party administrator, Sedgwick CMS, to coordinate employee leave requests, validation of eligibility, payment of applicable benefits, and return to work schedules. Walgreens' employees are provided a toll free number and a website providing access to a Sedgwick representative for the submission of leave requests or pertinent inquires. Upon submission of a leave request, Sedgwick representatives collect necessary documentation from Walgreens employees and their health care providers to assess eligibility for leave, then notify the responsible Store Manager of Sedgwick's determination on a leave request, providing only confirmation of leave approval, start of the employee's leave period, and return to work date.

through December 15, and again, Leman learned of this extension via email without specific information regarding the reason for Plaintiff's leave.

Plaintiff was released to return to work without restriction on December 16, 2009. Plaintiff received written confirmation regarding her return to work date in a writing, which also provided instructions on how Plaintiff could reactivate her short-term leave in the event she "did not recover sufficiently enough to resume [her] job duties." While Plaintiff did return to work on December 16, she arrived late without providing notice or offering an excuse. Plaintiff also arrived late for her shift on December 17 without providing notice or an excuse.

On December 19, Plaintiff failed to show up at all for her scheduled shift and called the store after her scheduled start time claiming to have been involved a car accident and requesting to take the entire day off from work. Plaintiff's request for the day off was granted.

On December 20, 2009, Plaintiff again failed to report for her scheduled shift and called the store after her scheduled start time claiming that she remained too shaken up from the car accident to report to work. On December 21, Plaintiff produced a copy of a police report filed December 19, describing a domestic violence incident that occurred on November 29, 2009. Plaintiff admitted that she made up the story about the car accident.

On December 22, 2009, Plaintiff reported late to work and left work early the same day notifying only a colleague that she was leaving early because her grandmother had passed away. Plaintiff later spoke to Lemen with regard to funeral leave.

On December 24, Plaintiff sought and received permission to arrive late for her shift and then asked to go home early. Around this time, Lemen agreed to allow Plaintiff to combine vacation days with her funeral leave allowance so that Plaintiff could be off from work from Christmas through the beginning of January 2010, all with pay.

Thereafter, in consultation with either employee relations or Regional Manager Marie Smith, Lemen was to issue Plaintiff a final written warning when she returned from funeral leave. That final written warning was to remind Plaintiff of her obligation to report to work on time and cautioned that further unexcused absences or late arrivals would result in further discipline, up to and including discharge. Lemen planned to issue the final written warning to Plaintiff when she returned to work for her next scheduled shift, which was January 4, 2010.

Prior to January 4, 2010, Plaintiff called Lemen who confirmed that Plaintiff was scheduled to work January 4. However, Plaintiff never appeared for her scheduled shift on January 4, and then failed to appear for her next scheduled shift on January 5. Plaintiff never called the store to report her absences either before her shifts or before expiration of those shifts. Without dispute, Plaintiff's cell phone records reflect approximately sixty outgoing calls from January 3 to the end of her scheduled shift on January 5, and none of those approximately sixty calls was made to Walgreens.

On the evening of January 5, Plaintiff called the Centerville Store and asked MGT Rebecca Whited for the number to file a disability claim. Lemen learned of Plaintiff's

call and her request for the disability hotline number and attempted to call Plaintiff using the phone number Walgreens had on file. However, that phone number was no longer in service.[3] Plaintiff failed to report to work or to call her store manager for the remainder of the week.

On January 7, 2010, Lemen sent Plaintiff a letter directing her to contact him by January 11 to discuss her employment status and to explain her absences. Lemen cautioned Plaintiff that her non-response or her failure to provide adequate documentation excusing her absences and tardiness would be interpreted as her resignation from employment. On January 8, Plaintiff returned to the Kettering Emergency Room for "alcohol intoxication and severe depression" stating she had been drinking one pint of vodka a day.

Despite asserting that she never received the letter from Leman, Plaintiff called Leman on January 11 and scheduled a meeting for the next morning. On January 12, at approximately 9:00 a.m., Plaintiff met with Leman and Smith and produced a discharge instruction sheet from her visit to the emergency room on January 8, as well as a copy of her grandmother's funeral notice. Plaintiff claims that she also attempted to provide a

---

[3] Plaintiff claims that Lemen was made aware that Plaintiff had a new telephone number by virtue of the fact that the phone number appeared on the police report she gave to Walgreens concerning the domestic violence incident in November 2009. There is no evidence that Plaintiff pointed to the number and advised Walgreens that the number on the police report differed in any way to the number formally on file with Walgreens. Leman testified that it is each employee's responsibility to update their own contact information, and that such information can be updated on the Walgreens website.

note from her family physician, Dr. Robinson, advising that Plaintiff had been treating for depression and should be off work from January 4, 2010 through January 31, 2010.[4] Leman and Smith testified seeing the discharge sheet and the funeral notice. However, both Leman and Smith also testified that Plaintiff never produced the note from Dr. Robinson.

Finding Plaintiff's explanations as to why she failed to contact her Manager inadequate, Smith converted Plaintiff's prior written warning into a termination for attendance issues, *i.e.*, no call no show.

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keeweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881,

---

[4] The note from Dr. Robinson is dated January 12, 2010, the same day she met with Leman and Smith. Plaintiff testified that she visited Dr. Robinson immediately before meeting with Leman and Smith at 9:00 a.m. on January 12, 2010.

886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id.* (citation omitted). In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the absence . . . of a genuine dispute[.]" Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989); *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029 (D.C.Cir.1988); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir.1989), *cert. denied*, 494 U.S. 1091 (1990)). Instead, "[i]t is the attorneys, not the judges, who have

interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id*. at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id*.

### III. RACE DISCRIMINATION

Plaintiff alleges that Walgreens discriminated against her on the basis of race. Plaintiff presents no direct evidence of race discrimination, and, therefore, her claim is analyzed under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Carson v. Patterson Companies, Inc.*, 423 Fed. Appx. 510, 513 (6th Cir. 2011). Pursuant to that analysis, Plaintiff bears the initial "burden of establishing a *prima facie* case of race discrimination[.]" *Id*. To do so, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for his job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted).

Here, Defendants argue that Plaintiff cannot demonstrate a *prima facie* case of race discrimination because she cannot satisfy the fourth requirement, *i.e.*, that she was either replaced by someone outside the protected class[5] or treated differently than a similarly

---

[5] Plaintiff does not argue that she was replaced by anyone outside the protected class following her termination on January 12, 2010.

situated person outside the protected class. Individuals are considered "similarly situated" for purposes of establishing a *prima facie* case of discrimination where they "have dealt with the same supervisor, have been subject to the same standards, and *engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007); *see also Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff argues that she has presented evidence of a white managerial employee, Denise Hetzel, who was placed on performance plans, and, only after years of counseling and training, was subsequently removed from her managerial position. The only evidence Plaintiff points to in an effort to show the nature of Hetzel's conduct is vague testimony that Hetzel displayed "problems with working with people and being respectful toward people." There is no evidence that Hetzel had any attendance problems or ever failed to show for work without calling.[6]

Hetzel's apparent difficulties working with others and display of disrespectful behavior cannot be viewed as the same or similar conduct when compared to Plaintiff's attendance issues. *See Wofford v. Middletown Tube Works, Inc.*, 67 Fed. Appx. 312, 316

---

[6] In their Reply memorandum, Defendants submit a document indicating that Hetzel is American Indian, rather than Caucasian. Plaintiff filed a Motion to Strike the exhibit on the basis that the exhibit lacks authentication. (Doc. 42). Whether Hetzel is American Indian or Caucasian does not impact this Court's analysis on summary judgment because, as set forth herein, Hetzel is not similarly situated. Accordingly, Plaintiff's Motion (Doc. 42) is **DENIED** as moot.

(6th Cir. 2003) (concluding that plaintiff, who was terminated for "no call no show" violations failed to demonstrate a *prima facie* case of race discrimination because "even if other white employees were disciplined for far more serious offenses, this evidence sheds no light on how each would have been treated had he committed the same offense as [plaintiff]").  Finding no similarity between Plaintiff's "no call no show" violations and Hetzel's apparent difficulties working with others and disrespectful behavior, Plaintiff fails to identify a similarly situated employee, and, therefore, fails to present a *prima facie* case of race discrimination.

Even if Plaintiff could satisfy her burden of establishing a *prima facie* case of discrimination on the basis of race, Defendant offers a non-discriminatory reason for Plaintiff's termination, *i.e.*, absenteeism.  "Employers who provide a legitimate, non-discriminatory reason for their . . . decision will be entitled to summary judgment unless plaintiffs can rebut the employer's explanation by demonstrating pretext."  *Id*.  Because Walgreens, without dispute, presents a non-discriminatory reason for its decision, it satisfies its burden in this regard.  The burden then shifts back to Plaintiff to "expose this proffered justification as a pretext for . . . discrimination."  *Bergman v. Baptist Healthcare Sys., Inc.*, 167 Fed. Appx. 441, 447 (6th Cir. 2006).

 "To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct."  *Simpson v. Vanderbilt Univ.*, 359 Fed.

Appx. 562, 569-70 (6th Cir. 2009) (citation omitted). To meet this burden, a plaintiff must present "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her].'" *Id.* (citations omitted); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (stating that "summary judgment [in favor of the employer] is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation"). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).

Plaintiff admits that the reason proffered by Walgreens has a basis in fact. Plaintiff argues, however, that the proffered reason did not actually motivate her termination. Plaintiff suggests that Smith, an African-American, harbored racially discriminatory animus toward other African-Americans and displayed such animus in her treatment of Leonard Baxter, a former Walgreens store manager. Plaintiff contends that Smith kept Baxter "trapped in management of stores in impoverished areas that had slim chance of becoming profitable based on their locations[,]" and that Smith "refused to transfer Baxter, while transferring recently promoted white managers into profitable locations in good neighborhoods."

To support her contentions in this regard, Plaintiff points solely to her own testimony and fails to demonstrate her actual knowledge of Baxter's efforts to gain transfers to other stores. Plaintiff admits that her knowledge in this regard came solely

from discussions with Baxter. (Doc. 29, PAGEID 356). Aside from conjecture and hearsay, there is no evidence in the record regarding actual transfer opportunities to the stores identified by Plaintiff, Baxter's actual efforts to gain transfers to any particular store, the candidates for those positions, the persons chosen to fill any positions or their backgrounds. In fact, Plaintiff fails to evidence any actual transfer request by Baxter that Smith denied. Simply put, Plaintiff's mere suggestions regarding Baxter's treatment by Smith are insufficient to create an issue of fact with regard to pretext.

Plaintiff also suggests, though not in specifically arguing pretext, that her "no call no show" offenses are insufficient to support her termination because Walgreens did not maintain a written "no call no show" policy. As noted by the Sixth Circuit, "[w]hether a policy is written or unwritten has minimal probative value on the issue of pretext." *Stein v. National City Bank*, 942 F.2d 1062, 1065 (6th Cir. 1991); *see also Quintanilla v. AK Tube LLC*, 477 F.Supp.2d 828, 834 (N.D. Ohio 2007) (stating that "the fact that the policy was unwritten does not mean that it is an unfit standard to which to hold employees"); *Williams v. Alabama Indus. Dev. Training*, 146 F.Supp.2d 1214, 1226 (M.D. Ala. 2001) (stating that "Congress does not force employers to amass an encyclopedic collection of rules that are known throughout the shop"). "When an employee . . . understands the general thrust of an unwritten work rule, decisions based on the rule are not pretextual absent concrete evidence that the rule was used as a mask for retaliation." *Williams*, 146 F.Supp.2d at 1226.

Here, nowhere does Plaintiff assert any misunderstanding of the requirement that she present for work as scheduled, and that if she could not work as scheduled, she was to timely provide notice of her absence. In fact, Plaintiff's testimony demonstrates that she held no such misunderstanding:

> Q: I'm talking about when you were going to take an unscheduled day off for whatever reason, headache, snowstorm, whatever that would be, what would you do? What did you do?
>
> A. Call, yes.
>
> Q. Call who?
>
> A. The store manager.
>
> Q. Why?
>
> A. To let them know.

(Doc. 29, PAGEID 354).

Certainly, employees should not have to be expressly told, either orally or in writing, that showing up for scheduled work shifts is a job requirement, and that failing to show for work without timely providing an excuse could result in termination, especially in the event of numerous absences. There are, perhaps, few rules more universally understood in the employment setting. One cannot fail to show for work without providing notice and plead ignorance when faced with discipline as a result. The Court concludes that the absence of a written or even an orally communicated "no call no show," in and of itself, is insufficient to demonstrate pretext.

Based on all of the foregoing, the Court concludes that no genuine issue of material fact remains with regard to Plaintiff's race discrimination claim and that Walgreens is entitled to summary judgment as a matter of law on this claim.

## IV. GENDER DISCRIMINATION

Next, Plaintiff asserts discrimination on the basis of gender. Again, Plaintiff presents no direct evidence of gender discrimination, and, therefore, her claim is "analyzed pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 ... (1981)." *Bartlett v. Gates*, 421 Fed. Appx. 485, 488 (6th Cir. 2010). "To make a prima facie showing of discrimination, a plaintiff must establish that he or she (1) 'was a member of a protected class'; (2) 'suffered an adverse employment action'; (3) 'was qualified for the position'; and (4) 'was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Colvin v. Veterans Admin. Med. Ctr.*, 390 Fed. Appx. 454, 457 (6th Cir. 2010).

Here, Plaintiff does not attempt to show that she was replaced by a male. In addition, Plaintiff makes no attempt to demonstrate that a similarly situated male employee was treated differently. Even assuming the existence of a *prima facie* case of gender discrimination, Plaintiff fails to demonstrate pretext. Again, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at

515-16.  Plaintiff makes no effort to show that the non-discriminatory reason proffered by Defendant was a pretext for gender discrimination.  Instead, Plaintiff attempts to demonstrate pretext by arguing that racial discrimination was the real reason behind her termination.

Thus, summary judgment is granted on Plaintiff's gender discrimination claims.

## V.  DISABILITY DISCRIMINATION

Plaintiff also argues that the was terminated as a result of her disability and asserts a claim of disability discrimination under Ohio law.  To prevail on a claim of disability discrimination under Ohio law, Plaintiff must show: "(1) that . . . she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question."  *Hood v. Diamond Products, Inc.*, 658 N.E.2d 738, 742 (Ohio 1996) (citation omitted).  In addition, "an employee must demonstrate that the employer knew, or should have known, of the employee's handicap and resulting limitations."  *Beauchamp v. CompuServe, Inc.*, 709 N.E.2d 863, 868 (Ohio App. 1998); *see also Slane v. MetaMateria Partners, LLC*, 892 N.E.2d 498, 464 (Ohio App. 2008).[7]

---

[7]  Under federal law, to show prove a *prima facie* case of disability discrimination, Plaintiff must evidence that: " (1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse action; (4) the employer knew or had reason to know of her disability; and (5) she was replaced or the job remained open."  *Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929 (6th Cir.2000)).

Here, Walgreens does not dispute, for purposes of summary judgment, that Plaintiff suffered from depression and that depression can be considered a disability entitled to protection under Ohio Rev. Code Chapter 4112. *See Mitnaul v. Fairmount Presbyterian Church*, 778 N.E.2d 1093, 1099 (Ohio App. 2002) (stating that depression can "qualify as a 'handicap' under R.C. 4112.02, depending on the circumstances of the case[,]" but "[t]he mere fact that [someone] suffered from depression is not sufficient, in and of itself, to meet the definition of a handicap under R.C. 4112.01") (citing *Beauchamp*, 709 N.E.2d 867). Defendant does, however, argue that Plaintiff cannot demonstrate that Defendants had knowledge of Plaintiff's disability and cannot demonstrate pretext.

There is no evidence in the record to suggest that either Leman or Smith possessed *actual* knowledge that Plaintiff was disabled as a result of depression at any time before January 12, 2010. Leman and Smith did, however, know that Plaintiff: (1) took disability leave in October 2009; (2) had been involved in an domestic violence incident in November 2009, (3) recently took funeral leave as a result of her grandmother's death; and (4) called the store on January 5, 2010 requesting the disability hotline number. Plaintiff suggests that these facts are sufficient to impute knowledge of Plaintiff's disability upon Defendants.

Initially, while both Leman and Smith knew Plaintiff took disability leave in October 2009, nothing in the record to suggests that Leman and Smith knew that Plaintiff

-17-

took disability leave as a result of depression. Both Leman and Smith testified that while they were aware that Plaintiff was granted disability leave, they were never given the reason why Plaintiff was disabled. In fact, both parties agree that Walgreens retains the services of a third party administrator to coordinate employee disability leave requests, and that once the request is approved, the responsible store manager is notified only that leave was approved, the start of the leave period and the return date. Nevertheless, Plaintiff returned to work from disability leave in mid-December 2009 and never formally requested an extension of that leave or to reactivate her leave.

Further, it is not reasonable to conclude that Leman and Smith should have known Plaintiff suffered from depression because they knew she was the victim of domestic violence in November 2009 and/or because her grandmother passed away in late December 2009. The domestic violence incident occurred in November 2009, and, following that incident, Plaintiff returned to work on December 16, 2009 without requesting an additional extension of her disability leave. In fact, Plaintiff arrived at work on December 16 and December 17, albeit late, and there is no indication by either party that Leman or Smith saw Plaintiff display any outward symptoms of depression while at work. Further neither party suggests that, aside from arriving timely, that Plaintiff was unable to perform the essential functions of the job during her shift.

Thus, while all of the foregoing information known by Smith and Leman certainly made them aware that Plaintiff was encountering significant issues in her personal life,

the Court cannot conclude that reasonable persons could find knowledge of these problems in Plaintiff's personal life amounts to knowledge that Plaintiff was disabled as a result of depression. *See Mitnaul*, 778 N.E.2d at 1099 (stating that even "[t]he mere fact that the appellant suffered from depression is not sufficient, in and of itself, to meet the definition of a handicap under R.C. 4112.01") (citing *Beauchamp,* 709 N.E.2d at 868 (finding no evidence that employer knew or should have known employee's disability even where employee told employee "that he was diagnosed with depression and was taking Prozac").

Thus, at least on or before January 4, 2010, when Leman intended to issue a final written warning letter reminding Plaintiff regarding her tardiness and absenteeism and informing her that further absenteeism could result in termination, neither Leman or Smith knew or should have known that Plaintiff was disabled as a result of depression. In addition, the Court concludes that Plaintiff's vague request for the disability hotline number on the evening of January 4, 2010, combined with all of the foregoing information, does not change the conclusion that Defendants neither knew nor should have known of Plaintiff's disability. However, there is a dispute as to whether Plaintiff specifically informed Leman and Smith about her disability on January 12, 2010 during the meeting at which Plaintiff was terminated.

However, even if the Court were to assume that Defendants knew or should have known about Plaintiff's disability and its limitations minutes before Plaintiff's

termination on January 12, 2010, Plaintiff cannot demonstrate that Defendants' proffered reason for terminating Plaintiff is pretext for discrimination. Plaintiff suggests that Smith's refusal to view the note from Dr. Robinson on January 12 demonstrates pretext. Plaintiff's argument in this regard is vague and not entirely developed.

Plaintiff's testimony regarding the January 12 suggests that Smith refused to view the note from Dr. Robinson because she had already decided to terminate Plaintiff prior to that meeting. Plaintiff's arguments in this regard appear to be either: (1) that upon offering the note, Defendants should have known that her absences were related to her depression, and, therefore, that terminating her for her absences amounts to terminating her because of her depression; or (2) Smith refusal to view Plaintiff's excuse evidences an apparent predisposition to terminate Plaintiff's employment regardless of excuse, an action inconsistent with the request for documentation in Leman's January 7 letter.

The Court rejects Plaintiff's suggestion that terminating her because of her absences amounts to terminating her because of her depression. "Being absent from work is not a disability." *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012) (citing *Nasser v. City of Columbus*, 92 Fed.Appx. 261 (6th Cir.2004)). Employers are entitled to make employment decisions based "on a record of absenteeism[,]" even if absences are attributable to a disability. *Cleveland Civil Serv. Comm'n v. Ohio Civil Rights Comm'n*, 565 N.E.2d 579, 583 (Ohio 1991); *see also Cooke v. SGS Tool Co.*, No. 19675, 2000 WL 487730, *6-8 (Ohio App. Apr. 26, 2000).

With regard to Plaintiff's suggestion that Defendant's disingenuousness in requesting documentation about her absences creates an issue of fact as to whether absenteeism was the true reason for Plaintiff's termination, such suggestion is also rejected. If Smith truly decided to terminate Plaintiff before the meeting on January 12, when Plaintiff purportedly first informed Smith and Leman of her depression, then such determination was made without knowledge of Plaintiff's disability.

Even insofar as the foregoing could be construed to create an issue of fact regarding pretext, such a weak issue of fact is insufficient to preclude summary judgment in favor of Defendants. *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 504 (6th Cir. 2007) (stating that "summary judgment is appropriate . . . if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position") (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)); *see also Chen*, 580 F.3d at 400 n.4 (stating that "summary judgment [in favor of the employer] is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation"). Accordingly, based on the foregoing, Defendants are entitled to summary judgment on Plaintiff's claim of disability discrimination under Ohio law.

## VI. EMOTIONAL DISTRESS

Next, Plaintiff asserts a claim of intentional infliction of emotional distress ("IIED"). To prevail on a claim for intentional infliction of emotional distress under Ohio law, one must prove that:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Shugart v. Ocwen Loan Servicing, LLC*, 747 F.Supp.2d 938, 944-45 (S.D. Ohio 2010) (citations omitted). Such a claim "must be based on more than 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Kimmel v. Lowe's Inc.*, No. 23982, 2011 WL 96317, at *2 (Ohio App. Jan. 7, 2011) (citing *Yeager v. Local Union 20*, 453 N.E.2d 666 (Ohio 1983)).

Initially, "[w]hile Ohio does not require expert medical testimony to support an intentional infliction of emotional distress claim, a plaintiff must at least provide some evidence beyond his or her own testimony." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1111 (6th Cir. 2008) (citing *Buckman-Peirson v. Brannon*, 822 N.E.2d 830, 841 (Ohio App. 2004)). Here, while there is evidence aside from Plaintiff's own testimony that she suffered from bouts of depression *before* her termination, there is nothing, aside from Plaintiff's own testimony, suggesting that she suffered severe emotional distress following her termination. Thus, summary judgment on Plaintiff's IIED claim is proper on this basis alone.

Even if the Court were inclined to permit such a claim supported by Plaintiff's testimony alone, her testimony fails to describe an actionable claim for IIED. The

following testimony, pointed to by Walgreens in support of its Motion, demonstrates

Plaintiff's mental state:

Q.     Describe for me your current mental state today.

A.     I'm fine.

Q.     How long have you felt that way?

A.     I mean, I'm not sure what you --

Q.     Well, you said you feel fine.  What do you mean by fine?

A.     I just feel I'm okay, but I still have my days of depressed. But I'm just going with the flow.

Q.     When is the last time you felt depressed?

A.     A few weeks ago, about three to four weeks ago.

Q.     When you lost the job at MetLife?

A.     No, that was --

Q.     That was what?

A.     That wasn't that, that was just – I just -- that's how I was feeling.

Q.     Why? What caused it?

A.     I don't know what caused it. I know some of it comes from a past relationship.

Q.     With Mr. Davis?

A.     Yes, and part of it -- I mean, even before I met him, I suffered from it. And I don't know who it was, what doctor or physician told me, they said you are called the runner. You are trying to run from the problem and avoid it.

Q.    What problem was that?

A.    Just ups and downs of life. I mean, sometimes it just seemed like it was too much.

Q.    How long did that episode last?  You said a few weeks ago you felt depressed, now you feel fine. How long did it last?

A.    I mean, it will last, I don't know, a day or two. Sometimes it can be a whole week I'm depressed.

Q.    What do you mean by depressed?  What you say a day or two a week you are depressed, what do you mean?

A.    That I don't want to do anything.  I don't want to eat. Sometimes I got to the point where I didn't want to live. I wouldn't talk to people. I wouldn't go nowhere.

Q.    And you said it's just -- what would prompt these episodes? The relationship was one of them, the relationship with Mr. Davis, you said?

A.    Uh-huh.

Q.    What else?

A.    Sometimes me and my mom would fall out.

Q.    You said fall out. Do you mean you would have a falling out, have a difficult time in your relationship?

A.    Yeah, argument, uh-huh.

Q.    Over mother-daughter stuff or –

A.    Pretty much, yeah. She always wants to control my life, and that's why we always would fall out.

Q.    Is that why you moved out in the first place?

A.      Yeah.

Q.      Anything else?

A.      Just the stress of not making the same amount of money, have
        to borrow gas money from people, have to pawn stuff for
        money to pay a bill.

Q.      Anything else?

A.      No, not that I can think of.

Q.      You had said that there were times a day or two a week that
        you would feel depressed.  What brings you out of it?

A.      I drink.  Maybe something will come up with the family, and
        we will have a get-together or my mom -- like just for
        Memorial Day, there was a get-together. I went there versus
        not doing anything.

Q.      How long do these -- or the --since you left Walgreens, you
        said the depression will be a day or two, sometimes a week.
        How long do the periods last where you say you feel fine?

A.      I can be fine a whole month.  Sometime it might only be two
        to three weeks.

(Doc. 29, PAGEID 325-326).  Based on this testimony, even assuming causation is

adequately shown, Plaintiff fails to demonstrate extreme and outrageous conduct on the

part of Defendants, and also fails to show that she suffered severe emotional distress.

        With regard to Defendant's conduct, Plaintiff attributes her depression to several

factors, such as her personal relationships.  Insofar as her testimony can be read to relate

such depression to her termination, Plaintiff simply states that depression is sometimes

caused by "not making the same amount of money."  However, simply terminating an

employee, in and of itself, or even for discriminatory reasons, is insufficient conduct upon which one can base a claim of IIED. *See Blackshear v. Interstate Brands Corp.*, No. 10–3696, 2012 WL 3553499, *6 (6th Cir. Aug. 20, 2012) (stating that "[a] decision to terminate an employee, regardless of whether the decision was discriminatory, is not sufficient to sustain a claim of intentional infliction of emotional distress"); *see also Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir.1999) (holding that "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more" because "[i]f such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress").

With regard the requirement that Plaintiff suffer from severe emotional distress, while the preceding testimony shows that Plaintiff suffers from bouts of "depression," these bouts are not so severe that no person could be expected to endure them. Serious mental anguish is emotional distress:

> beyond trifling mental disturbance, mere upset or hurt feelings. We believe that serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.

> A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia.

*Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983) (internal citations omitted). In fact,

courts in this district have concluded that "plaintiff's anguish must reach a level that no reasonable man could be expected to endure" and "[i]mplicit in this condition is the consequent inability to participate in the regular activities of life, including job responsibilities." *Mason v. Bexley City Sch. Dist.*, No. 2:07-CV-654, 2010 WL 987047, *32 (S.D. Ohio Mar. 15, 2010). Plaintiff's testimony simply fails to evidence emotional distress rises to the level required to sustain an IIED claim.

Accordingly, based on all of the foregoing, Defendants are entitled to summary judgment on Plaintiff's IIED claim.

## VII. WRONGFUL DISCHARGE

Next, Plaintiff asserts a common law wrongful discharge claim. Defendants assert that such a claim is foreclosed as a matter of law because Ohio Revised Code Chapter 4112 provides sufficient remedies for claims of wrongful discharge on the basis of discrimination. *See Carter v. Delaware Cnty Bd. of Comm'rs*, No. 2:07-cv-1189, 2009 WL 544907, *13 (S.D. Ohio Mar. 3, 2009) (concluding that plaintiff could not state a common-law wrongful discharge claim where state and federal statutes provided a "'full panoply of remedies'"). Plaintiff does not refute Defendants' contentions in this regard. Accordingly, Defendants are entitled to summary judgment on Plaintiff's wrongful discharge claim.

## VIII. DEFAMATION

Finally, Plaintiff asserts a claim of defamation in her Complaint. "Defamation is

the publication or communication of a false statement of fact that injures someone by adversely affecting the person's (1) reputation, (2) business, or (3) position—by exposure to public hatred, contempt, ridicule, shame, or disgrace." *Fuchs v. Scripps Howard Broad. Co.*, 868 N.E.2d 1024, 1033-34 (Ohio App. 2006) (citations omitted). To prevail on a claim of defamation, a plaintiff must prove "that (1) the defendant made a false statement, (2) that false statement was defamatory in the sense that it reflected unfavorably on the plaintiff's character or injured his trade or business, (3) the statement was published or communicated, and (4) the defendant acted with the necessary degree of fault." *Id*. (citations omitted). "A claim for defamation requires specific and personalized liability." *Shannahan v. B.F. Goodrich Aerospace Co.,* 993 F.Supp. 1107, 1118 (N.D. Ohio 1998).

In this case, Plaintiff makes no effort to support her claim for defamation in responding to Defendants' Motion for Summary Judgment. Accordingly, appearing that Plaintiff has abandoned this claim, and seeing no evidence in the record supporting such a claim, summary judgment in favor of Defendant is proper.

## IX. CONCLUSION

For the forgoing reasons, Defendants' Motion for Summary Judgment (Doc. 32) is **GRANTED** in its entirety. The Clerk shall enter judgment accordingly, and this case shall be **CLOSED**.

**IT IS SO ORDERED.**

Date:  November 19, 2012

    _s/ Timothy S. Black_
Timothy S. Black
United States District Judge